UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CATHLEEN J. SWIECH

             Plaintiff,

                                 **REPORT AND RECOMMENDATION**
                                        **06-CV-0342 (LEK)**

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

             Defendant.

# Jurisdiction

1.     This case was referred to this Court by Chief Judge Norman A. Mordue, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits.  Both parties have filed briefs.  For the reasons discussed below, the court recommends that the matter be remanded for further proceedings.

# Background

2.     Plaintiff Cathleen Swiech challenges the Administrative Law Judge's ("ALJ") determination that she is not entitled to disability insurance benefits ("DIB"), under the Social Security Act ("the Act").  Plaintiff alleges that she was disabled from November 22, 2002, due to multiple sclerosis ("MS"), retinitis pigmentosa, asthma, and anxiety.  In

---

[1] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of the Social Security Administration.  Pursuant to Federal Rules of Civil Procedure 25(d)(1), he is automatically substituted for former Commissioner Jo Anne B. Barnhart as the defendant in this action.

denying Plaintiff's claim, the ALJ found that Plaintiff was able to perform her past relevant work as a fire watcher, and therefore was not entitled to DIB (R. at 22).[2]

## Procedural History

3.      On May 10, 2004,[3] Plaintiff protectively filed for DIB alleging an onset date of November 22, 2002 (R. at 50).  This application was denied on July 7, 2004 (R. at 16).  Plaintiff filed a request for a hearing on August 1, 2004 (R. at 33).  Following the hearing, the ALJ issued a decision on August 29, 2005, in which he found Plaintiff had not met the requirements for disability (R. at 19-23).  Plaintiff requested review by the Appeals Council on August 31, 2005, and was denied on February 22, 2006 (R. at 13, 5-7).

4.      On March 20, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 405(g) and 1383(c)(3) of the Act, modify the decision of Defendant and grant DIB to Plaintiff for the period beginning November 22, 2002.[4]  Defendant filed an answer to Plaintiff's complaint on July 20, 2006, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Memorandum of Law (hereinafter called "Plaintiff's Brief") on September 5, 2006.  On September 28, 2006, Defendant filed a Memorandum of Law in Support of His Motion (hereinafter called "Defendant's Brief") for Judgment on

---

[2] Citations to the underlying Administration are designated as "R."  Pages 1-427 can be found in the Administrative Transcript.  Pages 428-450 can be found in the Supplemental Administrative Transcript.
[3] The record indicates that Plaintiff originally filed for DIB on October 10, 2003, and was denied on January 8, 2004 (R. at 14).  It does not appear that Plaintiff filed a request for a hearing.  Except for an apparent mistake in dates by the ALJ, this event is not referenced in Plaintiff's Brief, Defendant's Brief, or the ALJ's decision.  Therefore, it is not discussed.
[4] The ALJ's August 29, 2005, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

the Pleadings[5] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

## Facts

### Medical Examiners

On March 14, 1996, Dr. Sheridan,[6] a physician who had treated Plaintiff for vision problems for some time, sent a letter to Dr. Mango[7] for a second opinion to rule out a possible diagnosis of retinitis pigmentosa[8] (R. at 176).[9]  Dr. Sheridan noted that Plaintiff had been complaining of blurry vision in her left eye for about one year that could not be improved (R. at 176, 177).  Plaintiff had also complained that it "look[ed] like someone [was] shining a bright light in [her] eye" (R. at 261).

On January 5, 1999, Plaintiff went to the Oswego Hospital Primary/Urgent Care Center[10] for her inhaler prescription and acne medicine (R. at 233).  Plaintiff was given a prescription for Flovent[11] (R. at 234).  On April 29, 1999, Plaintiff was back at the Center for the flu as well as increased anxiety and stress due to a "recent marital break-up" (R. at 222).  Plaintiff was instructed to ask for counseling if she felt it necessary (R. at 223).

---

[5] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceedings as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

[6] The record suggests that Dr. Sheridan is an ophthalmologist.

[7] The record suggests that Dr. Mango is an ophthalmologist.

[8] A diseased "marked by progressive loss of retinal response …, retinal atrophy, attenuation of the retinal vessels, and clumping of the pigment, with contraction of the field of vision."  *Dorland's Illustrated Medical Dictionary*, 1685 (31st ed. 2007).

[9] The record contains Plaintiff's medical history with Dr. Sheridan dating back to 1987 (R. at 186).  As it is not relevant to this decision, it has been omitted.

[10] It appears from the record that Plaintiff saw Dr. Castro, her treating physician, on the following days at the Center: January 5, 1999, April 29, 1999, July 14, 1999, November 13, 2000, and January 16, 2001 (R. at 234, 223, 220, 216, 214).

[11] Trademark for fluticasone propionate, an anti-inflammatory.  *Dorland's* at 727, 730.

Plaintiff went back to the Center on July 7, 2000, complaining that her asthma was worse, and she was also feeling shakier and noted increased bruising (R. at 303). Plaintiff was instructed to try Allegra[12] (R. at 304).  Plaintiff was at the Center again on July 21, 2000 to recheck her asthma (R. at 217).  Plaintiff was instructed to continue to use her inhaler and to try Astelin[13] in the evening if she was having sinus pressure and drainage problems.  Id.  On November 13, 2000, Plaintiff went to the Center for a sore throat, laryngitis, fatigue, a headache, and her ears were popping (R. at 215).  Plaintiff went back to the Center on January 16, 2001 for chest congestion, a cough, and tightness in her chest (R. at 213).

On either June 28 or June 29, 2001,[14] Plaintiff went to the Center complaining of tremors and a dull ache in her arms (R. at 207, 295).  Plaintiff was told to start Advair,[15] and use albuteral[16] (R. at 207).  Plaintiff was at the Center again on July 12, 2001 with a possible upper respiratory infection (R. at 205).

On August 10, 2001, Plaintiff saw Dr. Patel[17] after being referred by Dr. Castro (R. at 162).  Plaintiff "complain[ed] of aching and burning in arms and forearms for the past few months."  Id.  Plaintiff also stated that occasionally she would "have pain in her shoulder area and occipital headaches."  Id.  Her extremities would also occasionally

---

[12] Trademark for fexofenadine hydrochloride, an antihistamine.  *Dorland's* at 51.
[13] Trademark for azelastine hydrochloride, an antihistamine.  Astelin, *Astelin Nasal Spray*, http://www.astelin.com (last visited Dec. 18, 2008).  *Dorland's* at 189.
[14] The record is unclear whether Plaintiff was at the Center on June 28 (R. at 296) or June 29, 2001 (R. at 295).
[15] Trademark for a combination of fluticasone propionate, an anti-inflammatory, and salmeterol xinafoate, a bronchodilator.  *Dorland's* at 35, 730, 1689.
[16] A bronchodilator.  *Dorland's at 46*.
[17] The record suggests that Dr. Patel is a neurologist.

jerk and her legs would cramp.  Id.  Dr. Patel wanted to rule out MS[18] and any cervical

degenerative disease that would cause these symptoms (R. at 163).  Plaintiff also noted

that she was on an inhaler, Advair, birth control pills, and was taking Paxil[19] up until

recently when she developed a tremor (R. at 162).

On August 16, 2001, Plaintiff went through several tests with Dr. Aziz,[20] a co-

worker of Dr. Patel's (R. at 197-199).  Dr. Aziz found that the brainstorm auditory

evoked response test ("BAER") showed that the "[t]he BAER [was] within the normal

limits bilaterally" (R. at 197).  The somatosensory evoked response test ("SSER")

showed that "[t]he SSER is within normal limits bilaterally" (R. at 198).  The pattern

reversal visual evoked response test ("PRVER") found that "[t]he PRVER from the left

eye is abnormal, while that from the right eye is within the normal limits" (R. at 199).

Plaintiff saw Dr. Patel again on September 20, 2001 (R. at 161).  Her MRI

showed several lesions that were suggestive of demyelinating lesions.  Id.  Plaintiff

complained of tremors in her upper extremities, intermittent lightheadedness, and

occipital headaches.  Id.  Plaintiff also saw spots during the headaches.  Id.  These

symptoms arose once or twice a week.  Id.  Plaintiff did not want to start any medication

at that time.  Id.

---

[18] "[A] disease in which there are foci of demyelination throughout the white matter of the central nervous system, sometimes extending into the gray matter; symptoms usually include weakness, incoordination, paresthesias, speech disturbances, and visual complaints."  *Dorland's* at 1706.
[19] Trademark for paroxetine hydrochloride, treats depression, obsessive compulsive panic, and anxiety disorders.  *Dorland's* at 1419, 1405.
[20] The record suggests that Dr. Aziz is a neurologist.

On September 23, 2001, it appears that Plaintiff was in some sort of vehicular accident and was taken to the Oswego Hospital[21] (R. at 274).  Plaintiff had abrasions on her forehead and right knee.  Id.  Plaintiff was told to apply bacitracin.  Id.

On November 5, 2001, Plaintiff met with Dr. Aziz (R. at 160).  Dr. Aziz questioned whether Plaintiff had MS but stated he could not make a definite diagnosis based on Plaintiff's symptoms.  Id.  Dr. Aziz suggested Plaintiff seek a second opinion at the MS clinic of Strong Memorial Hospital.  Id.  Plaintiff's medications were also switched from Zoloft[22] and amitriptyline[23] to Remeron.[24]  Id.

On January 30, 2002, Plaintiff saw Dr. Silverman[25] at the Heart Care Center based on a referral from Dr. Aziz (R. at 191).  Plaintiff's tilt-table test was negative (R. at 192).  Plaintiff saw Dr. Weinstock[26] at the Heart Care Center on February 13, 2002 for an echocardiogram (R. at 190).  Dr. Weinstock found "the presence of mitral valve prolapsed affecting both anterior and mitral valve leaflets and leaning perhaps to mild mitral regurgitation."  Id.  Dr. Silverman wrote Dr. Aziz a letter on February 13, 2002, stating that Plaintiff's cardiac rhythm did not appear to be the cause of her symptoms (R. at 188).

On February 11, 2002, Plaintiff met with Dr. Mihai[27] for a second opinion at Dr. Aziz's suggestion concerning a possible MS diagnosis (R. at 241).   Dr. Mihai also found that clinically Plaintiff did not have MS (R. at 243).  However, she recommended a

---

[21] The record is somewhat illegible (R. at 274).
[22] Trademark for sertraline hydrochloride, a serotonin reuptake inhibitor.  *Dorland's* at 2120, 1724.
[23] An antidepressant.  *Dorland's* at 64.
[24] Trademark for mirtazapine, an antidepressant.  *Dorland's* at 1646, 1186.
[25] Dr. Silvermen is a Fellow of the American College of Cardiology (R. at 188).
[26] Dr. Weinstock is a Fellow of the American College of Cardiology (R. at 190).
[27] The record suggests that Dr. Mihai is a neurologist.

repeat MRI to monitor the her disease progression.  Id.  Dr. Mihai suggested Plaintiff take Effexor[28] for her headaches.  Id.

On April 26, 2002, Dr. Mihai sent a letter stating that she had seen Plaintiff on February 11, 2002 (R. at 187).  She opined, based on an MRI, that clinically Plaintiff did not have MS.  Id.  However, Dr. Mihai noted, "all this MRI prove[ed] [was] that [Plaintiff's] condition [was] stable but it does not help make the diagnosis."  Id.  Dr. Mihai recommended Plaintiff have another MRI in three to six months, or if new symptoms arose.  Id.  She also recommended Effexor, to help ease Plaintiff's "fatigue, pains and even headaches, which have a 'tension' component."  Id.

On March 6, 2003, Plaintiff went back to the Oswego Hospital Primary/Urgent Care Center for a rash she had for three days on her chest, abdomen, upper thighs and arms (R. at 202).  Plaintiff was told to take Benadryl and apply a hydrocortisone cream (R. at 203).

Plaintiff saw Dr. Mihai again on December 10, 2003 (R. at 238).  Plaintiff added pain and numbness in her left side to her previous symptoms (R. at 239).  Plaintiff was instructed to have a repeat MRI which would be evaluated at their next session.  Id.  Plaintiff was also told to start amitriptyline.  Id.

On January 21, 2004, Plaintiff had an MRI which was "[u]nremarkable [] of the cervical spine with no signal abnormality noted and no significant change from prior study" (R. at 324).  Plaintiff's MDR, from the same day, also did not show much change from the March 1, 2002, study, except "[t]wo new small enhancing hyperintensities [] in the left cerebral hemisphere" which were "suspicious" for active plaque" (R. at 325).

---

[28] Trademark for venlafaxine hydrochloride, a serotonin-norepinephrine reuptake inhibitor.  *Dorland's* at 602, 2074.

On February 16, 2004, Plaintiff went back to Dr. Mihai (R. at 329).  Plaintiff continued to complain of light-headedness and headaches, but no photophobia or phonophobia.  Id.  Dr. Mihai noted that Plaintiff's MRI had no significant changes from the one performed one year prior.  Id.  She diagnosed Plaintiff with "a mild form of relapsing, remitting multiple sclerosis with clinical stability, but some progression and evidence of active disease on the brain MRI" (R. at 330).  Dr. Mihai suggested Plaintiff consider starting an immunomudulator of either Avonex[29] or Copaxone[30] because her disease was not very aggressive.  Id.

On March 2, 2004 Plaintiff began treatment with Dr. Magsino (R. at 338-339).  Plaintiff was started on Copaxone (R. at 338).

Plaintiff saw Dr. Mihai again on June 21, 2004 (R. at 433).  Plaintiff complained of pain and swelling from her Copaxone shots, and also feeling tired all the time but not being able to sleep (R. at 433).  Dr. Mihai found that Plaintiff's MS was clinically stable. Id.  Plaintiff was told to take Benadryl prior to her shot and to apply Preparation-H over the site after the injection (R. at 434).  Plaintiff's Lexapro[31] was increased and she was started on Provigil[32] and Midrin.[33]  Id.

On September 10, 2004, Plaintiff went back to Dr. Magsino, complaining of a swollen painful eye (R. at 430).  A concomitant conjunctival infection could not be totally

---

[29] Trademark for interferon beta-la, used to treat the relapsing types of MS.  *Dorland's* at 186, 962.
[30] Trademark for glatiramer acetate, "used to reduce relapses in multiple sclerosis; administered subcutaneously."  *Dorland's* at 419, 794.
[31] Trademark for escitalopram oxalate, an antidepressant.  *Dorland's* at 1047, 654.
[32] Trademark for modafinil, used to treat sleep disorders.  *Dorland's* at 1562, 1189.
[33] Trademark for isometheptene mucate and dichloralphenazone, both used to treat migraines and tension headaches, as well as acetaminophen.  *Dorland's* at 1183, 979, 520.

ruled out and Plaintiff was started on Polytrim[34] eye drops.  Id.  Plaintiff saw Dr. Magsino again on March 21, 2005, to refill her Advair (R. at 428).

On November 5, 2004 Plaintiff was diagnosed with viral conjunctivitis by the Eye Consultants of Syracuse and started on Blephamide[35] (R. at 447).

On December 21, 2004, Plaintiff saw Dr. Mihai again (R. at 431).  Plaintiff was started on amantadine[36] (R. at 432).

On April 29, 2005, Dr. Mihai filled out an MS medical source statement ("MSS") (R. at 435, 441).  Dr. Mihai found Plaintiff had a guarded prognosis with the following symptoms: fatigue; mild poor coordination; mild weakness; numbness, tingling, or other; sensory disturbance; bowel problems; sensitivity to heat; intermittent pain; depression; and intermittent nausea (R. at 435).  Dr. Mihai opined that Plaintiff's symptoms would often interfere with her attention and concentration (R. at 437).  Dr. Mihai also found that Plaintiff was capable of low stress jobs and her symptoms had lasted or could be expected to last at least twelve months.  Id.  Dr. Mihai instructed the reader to refer to her treatment notes instead of filling out the portion of the MSS dealing with Plaintiff's functional capacity to sit, stand, walk, lift, stoop, etc. (R. at 437-439).  Dr. Mihai also did not opine on whether Plaintiff had any environmental limitations or how many 'bad days' Plaintiff would have on average each month (R. at 440).  Dr. Mihai noted that "[m]ultiple sclerosis affects a person's energy level … in an unpredictable way.  During acute attacks, other system[s] can be affected.  The majority of MS patients have 'bad [and]

---

[34] Trademark for trimethoprim sulfate and polymyxin B sulfate, both are antibiotics.  *Dorland's* at 1516, 1994, 1512.

[35] Trademark for sulfacetamide sodium, treats eye infections, and prednisolone acetate, treats an allergy or inflammation.  *Dorland's* at 228, 1828, 1531.

[36] "[A]n antiviral of the adamantine group, used for prophylaxis and treatment of influenza A. … it is also used as an antidyskinetic in treatment of parkinsonism and drug-induced extrapyramidal reactions."  *Dorland's* at 57.

good' days and many can no[t] perform well in a regular job."  Id.  Finally, Dr. Mihai

opined that Plaintiff's condition and its resulting limitations would have existed since

November 22, 2002 (R. at 441).

Plaintiff saw Dr. Mihai again on August 9, 2005 (R. at 391).  Plaintiff was given a

prescription for Lortab[37] to help with her pain (R. at 392).  On December 12, 2005,

Plaintiff went back to see Dr. Mihai (R. at 387).  At that time, it was noted that Plaintiff

was currently taking Hydrocodone, Paxil, Advair, amitriptyline, and shots of Copaxone

(R. at 387, 389).  Dr. Mihai noted that she had a normal general physical examination

(R. at 387).  Plaintiff was started on Neurontin[38] for pain (R. at 389).

Plaintiff saw Dr. Mihai again on January 9, 2006 (R. at 384).  Plaintiff continued

to complain of feeling tired and achy.  Id.  Dr. Mihai diagnosed Plaintiff with fibromyalgia

and discussed treatment options with Plaintiff (R. at 385).  Plaintiff was instructed to

increase her dosage of amitriptyline at night.  Id.


**Independent Medical Examiners**

On June 22, 2004, Plaintiff was examined by independent medical examiner

("IME"), Jeanne Shapiro, Ph.D., for the Social Security Administration ("SSA") (R. at

349).  Dr. Shapiro diagnosed Plaintiff with Axis I, adjustment disorder with mixed

features (R. at 348).  Dr. Shapiro "recommended that [Plaintiff] consider short-term

individual psychological therapy to help her adjust to her diagnosis and the limitations

that it imposes on her."  In Dr. Shapiro's MSS, she stated that:

---

[37] Trademark for hydrocodone bitartrate and acetaminophen.  *Dorland's* at 1090.
[38] Trademark for gabapentin, an anticonvulsant.  *Dorland's* at 1287, 764.

> [v]ocationally, the claimant appears to be capable of understanding and following simple instructions and directions.  Barring any medical contraindications, she appears to be capable of performing simple and complex tasks with supervision and independently.  She appears to be capable of maintaining attention and concentration for tasks.  She can regularly attend to a routine and maintain a schedule.  She appears capable of learning new tasks.  She appears to be capable of making appropriate decisions.  She appears to be able to relate to and interact appropriately with others.  She appears to have some difficulty adequately dealing with stress (R. at 348).

Also on June 22, 2004, Plaintiff underwent a neurological exam with IME, Dr. Shayevitz, at the request of the SSA (R. at 353).  Dr. Shayevitz diagnosed Plaintiff with MS, back pain, asthma, headaches, and retinitis pigmentosa.  Id.  In her MSS, she found that Plaintiff had:

> no contraindications at this time to any specific activities such as sitting, standing, walking, stair climbing, any lifting, or carrying.  There would be limitations in very prolonged standing or walking, very prolonged or heavy repetitive lifting, or lifting heavy objects.  The claimant is also medically ill and limited by her poor energy.  Her hearing and speech are intact (R. at 353)

**RFC Analysis**

On January 8, 2004, S. Mastrogiacomo, an analyst for the SSA, completed a physical residual functional capacity ("RFC") assessment (R. at 253, 258).  The analyst found that Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry ten pounds, stand and/or walk at least two hours in an eight hour workday, sit about six hours in an eight hour workday, and had an unlimited ability to push and/or pull, other than as shown for lift and/or carry (R. at 254).  The analyst noted that Plaintiff had yet to be definitively diagnosed with MS.[39]  Id.  The analyst also found that Plaintiff had no postural, manipulative, visual, or communications limitations, but should avoid

---

[39] This analyst notation was made one month before Plaintiff's diagnosis (R. at 330).

concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to her asthma (R. at 255-256).

On July 7, 2004, another physical RFC assessment was completed by K. Stein, an analyst for the SSA (R. at 359).  He found that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk at least two hours in an eight hour workday, sit about six hours in an eight hour workday, and had an unlimited ability to push and/or pull, other than as shown for lift and/or carry (R. at 355).  He also found that Plaintiff was occasionally limited in her ability to climb, balance, stoop, kneel, crouch, and crawl (R. at 356).  He found that Plaintiff had no manipulative, visual, or communicate limitations (R. at 356-357).  Finally, he found that Plaintiff had no environmental limitations, except that she should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to her asthma.

Stein also filled out a non-severe impairment checklist in which he found that Plaintiff did not have more than a slight abnormality for understanding, carrying out and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting (R. at 360).

On July 9, 2004, Dr. Apacible completed a psychiatric review technique for Plaintiff, at the request of the SSA (R. at 361).  In it, he diagnosed Plaintiff with adjustment disorder with mixed features (R. at 364).  He found that Plaintiff had a mild restriction of daily living activities, a mild restriction of difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and did

not find whether Plaintiff had repeated episodes of deterioration, each of extended duration (R. at 371).

## Discussion

**Legal Standard of Review:**

6.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

7.      "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the

[Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In

other words, this Court must afford the Commissioner's determination considerable

deference, and may not substitute "its own judgment for that of the [Commissioner],

even if it might justifiably have reached a different result upon a *de novo* review."

Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

8.      The Commissioner has established a five-step sequential evaluation process to

determine whether an individual is disabled as defined under the Social Security Act.

See 20 C.F.R. §§ 404.1520, 416.920.  The United States Supreme Court recognized

the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct.

2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing

whether a claimant is disabled.

9.      This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental ability to do
> basic work activities.  If the claimant has such an impairment, the third
> inquiry is whether, based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations.  If the claimant
> has such an impairment, the [Commissioner] will consider him disabled
> with-out considering vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who is afflicted
> with a "listed" impairment is unable to perform substantial gainful activity.
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work.  Finally, if the
> claimant is unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v.

Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

10.     While the claimant has the burden of proof as to the first four steps, the

Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S.

at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final step of this

inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the

claimant's job qualifications by considering his physical ability, age, education, and work

experience.  Second, the Commissioner must determine whether jobs exist in the

national economy that a person having the claimant's qualifications could perform.  See

42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458,

460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

11.     In this case, the ALJ made the following findings with regard to factual

information as well as the five-step process set forth above: (1) Plaintiff met the

disability insured status requirements of the Act on November 22, 2002, and continued

to meet them through the date of the ALJ's decision (R. at 22); (2) Plaintiff had not

engaged in any substantial gainful activity (R. at 22); (3) Plaintiff's sole severe

impairment was MS (R. at 22); (4) Plaintiff had the following non-severe impairments:

asthma and adjustment disorder (R. at 22); (5) Plaintiff does not have an impairment or

combination of impairments which meets or medically equals any impairment listed in

Appendix 1, Subpart P, Regulations No. 4 (R. at 22); (6) Plaintiff's testimony was

generally credible (R. at 22); (7) Plaintiff had the following RFC: Plaintiff was limited to

sedentary work, which does not require lifting more than ten pounds or prolonged

standing/walking (R. at 22); Plaintiff is a younger individual (R. at 23); Plaintiff had a

high school education (R. at 23); Plaintiff was able to perform her past work as a fire

watcher (R. at 23).  Ultimately, the ALJ found that Plaintiff was not disabled, as defined

by the Act (R. at 23).

**Plaintiff's Allegations:**

12.      Plaintiff challenges the decision of the ALJ on the basis that it was not supported

by substantial evidence.  Specifically, Plaintiff argues that (1) the ALJ failed to engage in

a function-by-function analysis; (2) the ALJ's finding that Plaintiff's testimony was

generally credible was inconsistent with the RFC; and (3) the ALJ erred in finding

Plaintiff capable of performing her past relevant work.

**Allegation 1: The ALJ Erred by Not Making a Function-By-Function Finding**

13.      Plaintiff argues that the ALJ erred in not making a function-by-function analysis

before determining Plaintiff's RFC.  See Plaintiff's Brief, pp. 13-14.  Defendant responds

by arguing that the ALJ's RFC was supported by substantial evidence.  See Plaintiff's

Brief, 18-19.

According to SSR 96-8p, "[t]he RFC assessment must first identify the

individual's functional limitations or restrictions and assess his or her work-related

abilities on a function-by-function basis, including the functions in paragraphs (b),[40]

(c),[41] and (d)[42] of 20 CFR 404.1545 and 416.945.  Only after that may [the] RFC be

---

[40] "Physical abilities. … such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)…."  20 C.F.R. § 404.1545(b).

[41] "Mental abilities. … such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting…."  20 C.F.R. § 404.1545(c).

[42] Other abilities affected by impairment(s). … such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions…."  20 C.F.R. § 404.1545(d).

expressed in terms of the exertional levels of work …."  SSR 96-8p, 1996 WL 374184 at *1.

While other circuits have held that the SSR's language does not necessarily create an obligation to make a function-by-function analysis, the Second Circuit has not directly ruled on this issue.  See Delgado v. Comm'r. of Soc. Sec., 30 Fed.Appx. 542, 547 (6th Cir. 2002); Bencivengo v. Comm'r of Soc. Sec., 251 F.3d 153 (3d Cir. 2000) (table).  However, the Southern District of New York appears to follow the Third and Sixth Circuits' more flexible approach to the SSR's requirement.  See Novak v. Astrue, No. 07 Civ. 8435, 2008 WL 2882638, at *3, n. 47 (S.D.N.Y. July 25, 2008) (quoting Casino-Ortiz v. Astrue, 2007 WL 2745704, at *13-14 (S.D.N.Y. Sept. 21, 2007) (finding a function-by-function analysis not required, merely desirable, because the ALJ adequately supported his RFC with medical evidence from the record)). On the other hand, the Northern District of New York has repeatedly found it error to not make a function-by-function analysis.  See Miles v. Barnhart, No. 6:06-CV-391, 2008 WL 5191589, at *9 (N.D.N.Y. Dec. 8, 2008); Crysler v. Astrue, 563 F.Supp.2d 418, 437 (N.D.N.Y. 2008); McEaney v. Comm'r of Soc. Sec., 536 F.Supp. 252, 258-9 (N.D.N.Y. 2008).

Nevertheless, despite the Northern District's seemingly strict case law, many courts, including some Northern District Courts, have not found error if the ALJ's only failure was to group the functions, instead of evaluating them separately, as required by the SSR. SSR 96-8p, 1996 WL 374184 at *5; Martin v. Astrue, No. 5:05-CV-72, 2008 WL 4186339, at *16 (N.D.N.Y. Sept. 9, 2008) (finding the ALJ did not err by grouping functions in his function-by-function analysis because "treating the activities separately

17

would not have changed the result of the RFC determination").  However, here, failure

to analyze functions separately was not the ALJ's error. Rather, the ALJ failed to

engage in any meaningful function-by function analysis in this case.

Here, the only portion of the ALJ's decision that could be construed as a function-

by-function analysis was in his RFC assessment: Plaintiff is restricted "to sedentary

work, which does not require lifting more than 10 pounds or prolonged standing/walking"

(R. at 21).  Clearly this does not amount to a function-by-function analysis.  Indeed, it

appears as though the ALJ bypassed the function-by-function analysis, found Plaintiff

capable of sedentary work, and then merely repeated a portion of its definition.  20

C.F.R. § 404.1567 (stating, in relevant part, that "[s]edentary work involves lifting no

more than 10 pounds at a time . . . [and] walking and standing are required occasionally

. . . ."

Although the ALJ referenced the findings of the consultative examining physician

and the two disability analysts to support his RFC, Northern District Court decisions

suggest that this does not amount to completing a function-by-function analysis (R. at

22).  See Aull v. Astrue, 5:05-CV-1196, 2008 WL 2705520, at *8, 16, (N.D.N.Y. July 10,

2008) (the court remanded, in part, for failure to complete a function-by-function

analysis despite noting that the ALJ "summarized the medical evidence amassed in the

record . . ., as well as the various independent medical IMEs and other consultative

evaluations performed" in completing the five stop process); Zahirovic v. Astrue, No.

6:06-CV-981, 2008 WL 4519198, at *3, 9 (N.D.N.Y. Sept. 30 2008) (the court

remanded, in part, because the ALJ failed to complete a function-by-function analysis

despite noting that the ALJ had "relied upon medical evidence in the record, including

18

reports generated by treating and evaluating physicians" in completing the five step process).

Therefore, it is recommended that the ALJ's failure to complete the function-by-function analysis was error, and the decision of the ALJ may not be affirmed when "there is a reasonable basis for doubt whether the ALJ applied the correct legal principles . . . ." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### Allegation 2: The ALJ's RFC Finding was Inconsistent with His Finding that Plaintiff was "Generally Credible"

14.    Plaintiff argues that the ALJ's RFC was inconsistent with his finding that Plaintiff was generally credible because Plaintiff stated she was significantly limited by her fatigue and therefore the ALJ must not have developed the Plaintiff's RFC for an "ongoing and continuous basis." See Plaintiff's Brief, pp. 11-13.  Defendant responds by arguing that the ALJ's requirement that Plaintiff could only perform sedentary work is not inconsistent with his finding that Plaintiff was generally credible.  See Defendant's Brief, pp. 13-18.

In order to determine a claimant's RFC, the ALJ must assess "all of the relevant medical and other evidence."  20 C.F.R. § 404.1545(a)(3).  Also, the ALJ must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work . . . ." "on a regular and continuing basis." Id. §§ 404.1545(a)(4), (b).

Here, the ALJ found the following for Plaintiff's RFC: Plaintiff is restricted "to sedentary work, which does not require lifting more than 10 pounds or prolonged standing/walking" (R. at 21).  Plaintiff argues that the ALJ failed to take into account her

statements that on "some days she can't lift her head off the pillow or lift her arms if she

can sit up" and that she had "some degree of fatigue on a daily basis, with the severe

fatigue occurring for several days at a time, more than half the month."  See Plaintiff's

Brief, p. 11; (R. at 417-418).  Plaintiff contends that because the ALJ found Plaintiff

generally credible, failure to take into account these statements amounts to error.

"An administrative law judge may properly reject claims of severe, disabling pain

after weighing the objective medical evidence in the record, the claimant's demeanor,

and other indicia of credibility, but must set forth his or her reasons with sufficient

specificity to enable us to decide whether the determination is supported by substantial

evidence."  Lewis v. Apfel, 62 F.Supp.2d 648, 651 (N.D.N.Y. 1999) (internal citations

omitted).   To this end, the ALJ must follow a two-step process to evaluate Plaintiff's

contention of pain, set forth in SSR 96-7p, 1996 WL 374186, at *2:

> First, the adjudicator must consider whether there is an underlying
> medically determinable physical or medical impairment (s) … that could
> reasonably be expected to produce the individual's pain or other
> symptoms . . . .
> Second, . . . the adjudicator must evaluate the intensity,
> persistence, and limiting effects of the individual's symptoms to determine
> the extent to which the symptoms limit the individual's ability to do basic
> work activities . . . .

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if

Plaintiff's pain contentions are not supported by objective medical evidence, the ALJ

must consider the following factors in order to make a determination of Plaintiff's

credibility concerning his pain:

1. [Plaintiff's] daily activities;
2. The location, duration, frequency and intensity of [Plaintiff's] pain or other
   symptoms;
3. Precipitating and aggravating factors;

20

4. The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
6. Any measure [Plaintiff] use[s] or ha[s] used to relieve . . . pain or other symptoms;
7. Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds Plaintiff's pain contentions are not credible, he must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Young v. Astrue, No. 7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting Brandon v. Bowen, 666 F.Supp 604, 608 (S.D.N.Y. 1987)).

Here, the ALJ did not make the necessary finding at step one as to whether Plaintiff's medically determinable impairments could reasonably have caused her pain. This was error. See Hogan v. Astrue, 491 F.Supp.2d 347, 352-353 (W.D.N.Y. 2007) (remanding, in part, because the ALJ failed to find whether plaintiff's impairments "could reasonably be expected to produce the pain . . . she alleged" despite noting that the ALJ "carefully review[ed]" the seven factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii)).

The ALJ also did not engage in any meaningful analysis of the seven factors. Instead, the ALJ simply recited Plaintiff's statements at the hearing, ultimately finding her testimony to be "generally credible" (R. at 21). This, was also error. See Gorham v. Astrue, No. 7:06-CV-764, 2008 WL 4030650, at *10 (N.D.N.Y. Aug. 25, 2008) (remanding, in part because, "[t]he ALJ failed to fully discuss many of the factors set forth in the regulations").

21

On remand, the Court suggests that the ALJ articulate his reasoning for finding certain of Plaintiff's statements more credible than others and also address the other errors in credibility.

**Allegation 3: The ALJ Erred in Finding Plaintiff Could Perform Her Past Relevant Work**

15.    Plaintiff's final argument is that the ALJ erred in (a) finding Plaintiff could perform her past relevant work as a fire watcher because there was not enough information in the record to determine Plaintiff's work as she actually performed it; and (b) the ALJ's finding was inconsistent with the description of the position in the Dictionary of Occupational Titles ("DOT").  <u>See</u> Plaintiff's Brief, pp. 14-15.  Defendant responds by arguing that there was enough information in the record to support the ALJ's finding, and therefore, whether his RFC was inconsistent with the DOT is irrelevant.  <u>See</u> Defendant's Brief, pp. 19-21.

As the RFC was necessarily flawed, the Court cannot render a recommendation as to whether there was sufficient evidence in the record to support the ALJ's conclusion that Plaintiff could perform her past work.  Similarly, the Court cannot find whether the ALJ's RFC was in compliance with the DOT.

## Conclusion

Based on the foregoing, it is recommended that Defendant's motion for judgment on the pleadings should be DENIED and REMANDED for reconsideration. Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge


Syracuse, New York

DATED:        March 5, 2009

### ORDERS

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby


**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.


**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.


**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);   *Small v.*

*Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);   *Wesolek v.*

*Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and recommendation to the attorneys for

the Plaintiff and the Defendants.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge


Syracuse, New York

DATED:      March 5, 2009